**U.S. Department of Justice**

United States Attorney
District of New Jersey

---

Kathleen P. O'Leary
Assistant U.S. Attorney

970 Broad Street, Suite 700
Newark, NJ 07102

(973)645-2700
Direct Dial (973)645-2841
Fax (973)645-3497

August 8, 2013

**VIA REGULAR MAIL AND ECF**
Hon. Susan D. Wigenton
United States District Court
Martin Luther King, Jr. Federal Building & Courthouse
50 Walnut Street
Newark, NJ 07102

    Re:   United States v. Columbia Shipmanagement (Deutschland) GmbH
         (Crim. No. 13-205) (SDW); and
        United States v. Columbia Shipmanagement Ltd.
         (Crim. No. 13-193) (SDW)

Dear Judge Wigenton:

    Enclosed please find the Government's Unopposed Motion for Whistleblower Awards and a proposed Order in the above-referenced matter.

    If the form of order meets with your approval, kindly execute it, and have your deputy file the same with the Clerk of the Court.

                          Respectfully submitted,

                          PAUL J. FISHMAN
                          United States Attorney

                          By: Kathleen P. O'Leary
                          Assistant United States Attorney

Encl.

cc: Tom Mills, Esq. (via ECF)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal Nos. 13-205 and 13-193 (SDW) |
| v. : | |
| : | |
| COLUMBIA SHIPMANAGEMENT : | Hon. Susan D. Wigenton |
| (DEUTSCHLAND) GmbH, and : | |
| COLUMBIA SHIPMANAGEMENT LTD. : | |
| : | |
| Defendants : | |

GOVERNMENT'S UNOPPOSED MOTION
FOR WHISTLEBLOWER AWARDS

The United States, by and through undersigned counsel, respectfully files this motion requesting, pursuant to the Act to Prevent Pollution from Ships ("APPS"), Title 33, United States Code, Section 1908(a), that this Court grant one-half of the criminal fines imposed pursuant to APPS in the above captioned cases to whistleblower crew members who notified the Coast Guard of the criminal conduct on board the *M/T King Emerald*, the *M/T Nordic Passat, and* the *M/V Cape Maas* and whose information led directly to the conviction of both corporate defendants.

I. **Introduction**

Congress provided the Court with sole discretion in whether to grant an award of up to one-half of the criminal fines imposed pursuant to APPS to persons providing information that results in a conviction. 33 U.S.C. § 1908(a) (*"In the discretion of the Court, an amount equal to not more than ½ of such fine may be paid to the person giving information leading to conviction."* (emphasis added)). As set forth below, the government recommends that the Court

make the maximum award from the maximum criminal fine and divide the amount equally among those who played a role in the overall result. It is undisputed that the whistleblower's actions and information led to the charges and convictions in this case. While the government does not think that a criminal defendant has or should have any standing to assert whether or how the Court should issue a whistleblower award under APPS, the government nevertheless asked the defendants if they have a position on this issue. Defense counsel for the defendants in this case have indicated that their clients take no position on the government's motion or how the Court should exercise its discretion.

On July 23, 2013, the Court sentenced defendants Columbia Shipmanagement Deutschland GmbH and Columbia Shimpmanagment LTD. (Criminal Nos. 13-205 and 13-193) to pay a total monetary penalty consisting of $10.4 million, of which $7,800,000 was designated as criminal fine and $2,600,000 paid as organizational community service. Pursuant a Rule 11(c)(1)(C) plea agreement, Defendant Columbia Shipmanagement (Deutschland) GmbH pleaded guilty to five counts, including one APPS count, was sentenced to pay a $4,800,000 criminal fine and defendant Columbia Shipmanagement LTD pleaded guilty to five counts, including three APPS counts, and was sentenced to pay a $3,000,000 criminal fine. Based upon the maximum criminal fine of $500,000 per count (or a total of $2 million in fines available for the four APPS counts), the government recommends that the Court award one-half of this amount ($1 million) as an award to those who notified the Coast Guard and provided evidence leading to the conviction of the two corporate defendants. As set forth below, the government further recommends that the Court treat the whistleblowers equally regardless of ship or individual role for their collective part in achieving the overall prosecution result. This would

result in an APPS award in the amount of $111,111 for each of the nine whistleblowers.

## II. Background

As set forth in the Joint Factual Statement that is part of the plea agreement, and was previously filed with the Court, this prosecution was initiated in the District of New Jersey after two crew members on the *M/T King Emerald* informed the Coast Guard of environmental violations taking place on that vessel. Unrelated whistleblowers subsequently reported similar violations on the *M/T Nordic Passat* in Deleware and the *M/V Cape Maas* in California. In the government's view, the individual counts of conviction as well as the overall prosecution result are attributable to these whistleblowers. While there were others who provided helpful information after the fact, those participating in a plan to notify the Coast Guard and provide evidence were the most critical witnesses. The primary goals of the statute can best be achieved by placing emphasis on recognizing those who inform the government about crimes that would otherwise go undetected.

The APPS whistleblower award provision serves a valuable law enforcement purpose. Deliberate violations of MARPOL and United States law are far too common. There have been multiple prosecutions in virtually every major port city in the United States. Criminal conduct that takes place within the small community of those living and working aboard vessels is very difficult to detect. This reward provision has proved to be a valuable tool for uncovering these crimes, and it is by no means unique to the maritime industry.[1] The availability of the APPS

---

[1] *See, e.g.,* Refuse Act, 33 U.S.C. § 411; CERCLA, 42 U.S.C. § 9609(d); Endangered Species Act of 1973, 16 U.S.C. §1540(d); Bald and Golden Eagle Protection Act, 16 U.S.C. § 668(a); Internal Revenue Service, 26 U.S.C. § 7623; Tariff Act, 19 U.S.C. § 1619. A more

award aptly reflects the realities of life at sea and the pollution of the oceans. Because the pollution takes place in the middle of the ocean and usually at night, the only people likely to know about the conduct and the falsification of ship records used in port are the employees in the engine room. Each year, thousands of seafarers participate in or are aware of illegal conduct aboard their vessels. A tiny minority choose to take active measure to stop the wrongdoing and bear witness. The government's success in identifying the activity and obtaining sufficient evidence to support investigations and prosecutions is partly based on the willingness of lower level crew members to step forward.

However, these crew members must weigh their decision to step forward against the possibility that they may forever be barred from working in their chosen profession and may be subject to physical harm and abuse. The whistleblowers in this case, like those in other similar prosecutions, have indicated that they feared notifying the Coast Guard because they suspect that they will be subject to retaliation not just by their employer, but by manning agencies and other companies. The fears of these individuals were readily observable during debriefings with government representatives, even with the assistance of criminal defense counsel.

A monetary award both rewards the crew member for taking that risk and may provide an incentive for other crew members on other vessels to alert inspectors and investigators regarding similar crimes. Accordingly, numerous courts have ordered whistleblower awards in vessel

---

recent enactment pertaining to the operation of cruise ships in Alaska also has a similar provision, demonstrating continued Congressional interest in creating incentives to reward those who assist the government in bringing criminal prosecutions. Pub. L. 106-554, § 1(a)(4) [Div. B, Title XIV, § 1409(e)], Dec. 21, 2000, 114 Stat. 2763, 2763a-315, enacting provisions set out as Historical and Statutory Notes to 33 U.S.C. § 1901.

pollution cases where the facts supported an award.[2]

---

[2]See e.g., *United States v. Nimmrich & Prahm Bereederung et al*, (S.D. Texas; D. Alaska 2012) (court awarded the three whistleblowers $67,000 each); *United States v. Giuseppe Bottiglieri Shipping Company*, (S.D. Alabama 2012) (court awarded $110,000 to each of four whistleblowers and $60,000 to a fifth whistleblower); *United States v. Atlas Ship Management Ltd*, (M.D. Florida 2010) (court awarded two whistleblowers $125,000 each); United *States v. Irika Maritime, S.A.*, (W.D.WA. 2007) (court awarded one-half of $500,000 criminal fine to second engineer who reported illegal discharges and falsified records to Coast Guard); *United States v. Wallenius Ship Management Pte.* (D.N.J. 2006) (court awarded one-half of $5 million fine to be divided among four crew members who sent a fax to an international seafarers' union alleging that they were being ordered to engage in deliberate acts of pollution); *United States v. Sun Ace Shipping Company et al.*, (D.N.J. 2006) (court awarded half of a $200,000 fine to be divided among three whistleblowers, two Oilers and a Wiper, who lodged complaints with a religious organization that they were being forced to bypass pollution control equipment); *United States v. MK Shipmanagement Company, Ltd.*, (D. N. J. 2006) (court awarded half of a $200,000 fine to be split between two whistleblowers, $75,000 was awarded to the Third Engineer for presenting photos and records documenting illegal discharges; $25,000 was awarded to the ship's cook who contacted the government); *United States v. OMI*, (D. N.J. 2004) (court awarded one-half of a $4.2 million criminal fine to a Second Engineer who upon arrival asked for directions to local police department and reported illegal discharges and falsified records); *United States v. Sabine Transportation*, (D. Iowa 2004) (court awarded three employee whistleblowers one-half of $2.0 million criminal fine); *United States v. Botelho Shipping Corp.*, (D. Oregon 2003) (court awarded crew member who passed note to investigators disclosing overboard discharges of oil contaminated waste water $225,000, or one-half of the criminal fine issued for an APPS violation); *United States v. Norwegian Cruise Lines* (S.D. Fla. 2002) (court awarded a former employee whistleblower $250,000, which was one quarter of the $1 million criminal fine, for informing the EPA about unlawful discharges and false statements in the Oil Record Book of the *S.S. Norway* cruise ship); *United States v. D/S Progress* (D. Md. 2002) (court awarded two employee whistleblowers with half of the $250,000 criminal fine under APPS for slipping a handwritten note to a U.S. Coast Guard inspector that disclosed a crack in the hull of an oil tanker and which resulted in the discovery of other violations); *United States v. Holland America*, (D. Alaska 1999) (court awarded a whistleblower crew member with one half of the $1 million criminal fine for informing the government of the unlawful discharges of waste oil in violation of APPS); *United States v. Crescent Ship Services* (E.D. La. 1995) (court rewarded a company whistleblower with half of the $250,000 fine for conspiracy to violate APPS); *United States v. Regency Cruises, Inc.* (M.D. Fla. 1995) (court split one half of the $250,000 fine among two different witnesses who reported the pollution to the government); *United States v. Princess Cruise Lines* (S.D. Fla. 1993) (court awarded cruise ship passenger with one half of the $500,000 criminal fine for providing the government with a video tape of crew members dumping plastic bags of garbage into the ocean).

The whistleblowers in this case provided information at the time of the initial Coast Guard boardings and inspections. All but one stayed in the United States for an extended period of time away from family and other work during which they continued to proffer, meet with investigators, and provide other assistance to investigators. The information and testimony that they provided, as well as their continued availability here in the United States as witnesses, helped to secure the guilty pleas of the defendants (as well as three individual defendants).

## II. Whistleblower Contributions

Set forth below is a summary of the key contributions of the whistleblowers based upon the government's investigation.

### A. *M/T King Emerald*

Edison Dimatulac: Mr. Dimatulac served as an oiler onboard the *M/T King Emerald*. On May 7, 2012, Mr. Dimatulac made the initial phone call to the Coast Guard reporting that the senior engineering officers of the vessel had illegally discharged oily bilge waste on at least three occasions. This phone call is what led to the Coast Guard boarding and inspecting the vessel. During the Coast Guard inspection, Mr. Dimatulac provided additional information to the Coast Guard detailing the use of the general service pump to illegally discharge oily bilge waste directly overboard. Since returning home to the Phillippines, Mr. Dimatulac has informed the government that he has been unable to find employment as a mariner and fears that he, as a result of cooperating in the prosecution of this case, may never work in the maritime industry again.

2. Rafael Cempron: Mr. Cempron served as the 3rd Engineer onboard the *M/T King Emerald*. During the Coast Guard's inspection of the vessel, Mr. Cempron approached one of the members of the Coast Guard boarding team and handed her a piece of paper with a drawing

depicting how the 2nd Engineer was using the general service pump and associated piping to illegally discharge oily bilge waste. The piece of paper also contained the dates and location of the vessel during two of the illegal discharges. During his interview with the Coast Guard members, Mr. Cempron provided detailed information explaining how the 2nd Engineer had bypassed the vessel's Oily Water Separator, discharged oily bilge waste directly overboard, and falsified the Oil Record Book. Additionally, Mr. Cempron provided the Coast Guard with photos he had taken on his cell phone previously showing what he understood to be a different bypass mechanism used to discharge oily bilge waste directly overboard. Since returning home to the Phillippines, Mr. Cempron has informed the government that he has been unable to find employment as a mariner and fears that he, as a result of cooperating in the prosecution of this case, may never work in the maritime industry again.

    3. <u>Jerry Aromin</u>: Mr. Aromin served as the 3rd Officer onboard the *M/T King Emerald*. As a deck officer, Mr. Amorim was present on the bridge of the vessel the first time the 2nd Engineer used the general service pump to illegally discharge oily bilge waste (when the general service pump is used, it triggers a light on the bridge of the vessel). Mr. Aromin discussed this with Mr. Cempron, and Cempron told Aromin that he suspected the 2nd Engineer was using the general service pump to illegally discharge oily bilge waste. A few days later, Mr. Aromin was present on the bridge of the vessel when the general service pump indicator light came on again. This time, Mr. Amorim noted the date and time of the general service pump's use in the ship's Deck Log Book, and sent Dimatulac to the engine room to investigate the cause of the light coming on. When Dimatulac entered the engine room, he observed the 2nd Engineer taking soundings of the bilge tanks. Mr. Aromin shared all of this information during the initial Coast

Guard inspection and subsequently with government investigators. The information he recorded in the Deck Log Book and provided at the time of the Coast Guard inspection and thereafter was important to corroborating the allegations of the other whistleblowers. Since returning home to the Phillippines, Mr. Aromin has advised the government that he has been unable to find employment as a mariner and fears that he, as a result of cooperating in the prosecution of this case, may never work in the maritime industry again.

    B.    *M/T Nordic Passat*

4. <u>Lester B. Ledesma</u>. Mr. Ledesma served as an Oiler onboard the *M/T Nordic Passat*. While the Coast Guard was onboard the vessel conducting a previously scheduled compliance inspection, Mr. Ledesma approached one of the Coast Guard members and handed him a thumb drive and a note that read "illegal activities using magic pipes." This thumb drive contained photos and video showing the transfer of oily bilge waste from the vessel's Bilge Holding Tank to the vessel's sewage treatment and overboard discharge piping. The pictures also showed the transfer of oil sludge from the engine room, and it was later determined that this sludge was sent to the vessel's number 6 cargo tank and offloaded to unsuspecting refineries. The photos were taken by Mr. Ledesma using his cell phone. Mr. Ledesma and the other Filipino whistleblowers on the *M/T Nordic Passat* served in subordinate positions to officers which were from Eastern European countries. Mr. Ledesma discussed his intention to notify the Coast Guard with the other crew members mentioned below. These individuals appear to have had a mutual understanding that they were "in the same boat" and that they would each be supporting each other once the Coast Guard was informed of the criminal conduct. This understanding appears to have played some role in emboldening each to participate in the plan to notify the authorities.

5. <u>Antonio S. Galuno</u>. Mr. Galuno served as an Oiler onboard the *M/T Nordic Passat*. Mr. Galuno used his video camera to make the video that was on the thumb drive given to the Coast Guard. Additionally, Mr. Galuno provided the government with detailed information regarding the illegal discharges of oily bilge waste. Mr. Galuno had worked for Columbia Shipmanagement for the longest period of time and also provided additional information that helped to result in the convictions.

6. <u>Vicente N. Nebul</u>. Mr. Nebul served as the 3rd Engineer onboard the *M/T Nordic Passat*. Mr. Nebul assisted Mr. Galuno in making the video that was given to the Coast Guard depicting the illegal transfer and discharge of oily bilge waste. Once the Coast Guard came onboard the vessel to conduct the inspection, Mr. Nebul hid the hoses that were used to make the illegal discharges because he was afraid that the senior officers of the ship might destroy this evidence. Mr. Nebul showed the Coast Guard inspectors where he had hidden the hoses and explained to them how the hoses were used to make the discharges. Additionally, Mr. Nebul provided the Coast Guard inspectors with drawings/schematics depicting how the discharges were done, and also gave the Coast Guard inspectors Daily Sounding Log records that assisted the government with understanding the volumes of waste that had been discharged overboard.

7. <u>Kenneth Andrew Avenido</u>. Mr. Avenido served as the 4th Engineer onboard the *M/T Nordic Passat*. Mr. Avenido assisted Mr. Ledesma with taking the photos that were provided to the Coast Guard and provided the Coast Guard inspectors with valuable information detailing how the illegal transfers and discharges were being conducted. Additionally, prior to the Coast Guard boarding, and in preparation for blowing the whistle, Mr. Avenido reached out to another crew member (Mr. Papasin, discussed below) for assistance in locating the hoses and pump used

to make the discharges so that these items could be turned over to the Coast Guard. Mr. Avenido was directed to lie to the Coast Guard inspectors by a senior officer, but declined to do so.

        8. <u>Alipo J. Papasin</u>. Mr. Papasin served as the Fitter onboard the *M/T Nordic Passat*. As the fitter, Mr. Papasin had knowledge of the vessel's piping layout and knew where the hoses and portable pump used to make the illegal discharges were stored. When approached by Mr. Avenido, Mr. Papasin agreed to assist the other whistleblowers in reporting the discharges to the Coast Guard, and showed Mr. Avenido where the hoses and pump were stored so that these items could be preserved and given to the Coast Guard.

        C.    *M/V Cape Maas*

        9. <u>Jonathan G. Panti</u>. Mr. Panti served as an Oiler onboard the *M/V Cape Maas*, and was the only whistleblower onboard that vessel. Mr. Panti called the Coast Guard and reported that the vessel had been illegally discharging oily bilge waste overboard. This phone call led the Coast Guard to board the vessel and conduct an inspection. During the Coast Guard boarding, Mr. Panti provided the Coast Guard with a video showing the Oily Water Separator being operated with the sample line removed from the Oil Content Monitor and the overboard discharge valve open (allowing the discharge of oily bilge waste in concentrations greater than the legal limit of 15 parts per million). Mr. Panti also provided the Coast Guard with detailed information as to how the system was being "tricked" in order to illegally discharge oily bilge waste. At the Coast Guard's request, Mr. Panti was removed from the vessel in San Francisco because of concerns for his safety and sent home to the Philippines.

### III.  <u>Conclusion</u>

        Pursuant to the entire record in this case, including the information set forth herein and

the Joint Factual Statement, the United States respectfully submits that an award in this matter would be fully consistent with the manifest purpose of the statute to encourage those with information about unlawful conduct to come forward and disclose that information to authorities. The undisputed facts, as set forth herein, and in the Joint Factual Statement, demonstrates that these individuals provided the impetus for the criminal investigations, helped the government to secure relevant evidence, and encouraged other witnesses to cooperate. In pleading guilty, the corporate defendants have acknowledged that the allegations made by these whistleblowers were in fact true. Accordingly, the United States respectfully requests that the Court grant a whistleblower award of $1 million dollars to be split equally between the nine whistleblowers identified herein.

Respectfully submitted,

PAUL J. FISHMAN
UNITED STATES ATTORNEY
DISTRICT OF NEW JERSEY

RICHARD G. DREHER
ACTING ASSISTANT ATTORNEY
GENERAL
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

By: /s/ Kathleen P. O'Leary  8/8/13
KATHLEEN P. O'LEARY          Date
Assistant United States Attorney

By: /s/ Richard A. Udell  8/8/13
RICHARD A. UDELL             Date
Senior Counsel
Environmental Crimes Section
U.S. Department of Justice

/s/ Stephen Da Ponte  8/8/13
STEPHEN DA PONTE             Date
Trial Attorney
Environmental Crimes Section
U.S. Department of Justice

-11-

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
|---|---|---|
| v. | : | Case Nos. 13-205 and 13-193 (SDW) |
| COLUMBIA SHIPMANAGEMENT (DEUTSCHLAND) GmbH and COLUMBIA SHIPMANAGEMENT LTD. | : | ORDER |

This matter having been opened to the Court upon motion by Paul J. Fishman, United States Attorney for the District of New Jersey (Kathleen P. O'Leary, Assistant U.S. Attorney, appearing), and the U.S. Department of Justice, Environmental Crimes Section (Richard A. Udell, Senior Counsel, and Stephen Da Ponte, Trial Attorney, appearing), for an order, pursuant to the Act to Prevent Pollution from Ships, Title 33, United States Code, Section 1908(a) ("APPS"), directing that one-half of the criminal fine assessed the defendants in this matter, Columbia Shipmanagement (Deutschland) GmbH and Columbia Shipmanagement Ltd. (Tom Mills, Esq, appearing) (hereinafter, collectively, the "defendants"), be paid to the following nine crew members who served aboard the following vessels:

| *M/T King Emerald* | *M/T Nordic Passat* | *M/V Cape Maas* |
|---|---|---|
| Edison Dimatulac (Oiler) Rafael Cempron (3rd Engineer) Jerry Aromin (3rd Officer) | Lester B. Ledesma (Oiler) Antonio S. Galuno (Oiler) Vicente N. Nebul (3rd Engineer) Kenneth Andrew Avenido (4th Engineer) Alipo J. Papasin (Fitter) | Jonathan G. Panti (Oiler) |

(hereinafter, collectively, the "crew members"); and the Court having the authority and discretion to issue a monetary award of up to one half of any criminal fine to those

providing information leading to a conviction under APPS; and based on the entire record of this case, including the government's motion and the previously filed Joint Factual Statement; and the defendants having no objection to the government's motion; and for good and sufficient cause shown;

IT IS THE FINDING OF THIS COURT that the government's motion should be granted for the following reasons:

(1) Pursuant to APPS, the undisputed information and evidence the crew members provided was the impetus for the criminal investigations, led to the successful seizure of evidence, led other witnesses to cooperate, and resulted in the conviction of the defendants; and

(2) an award in this matter is consistent with the manifest purpose of APPS of encouraging those with information about unlawful conduct to come forward and disclose that information to authorities.

IT IS, therefore, on this _____ day of August, 2013

ORDERED that the government's motion be, and hereby is, granted and that a payment in the amount of $111,111 be awarded to each of the following crew members: Rafael Cempron, Jerry Aromin, and Edison Dimatulac, formerly of the *M/T King Emerald*; Vicente N. Nebul, Kenneth Andrew Avenido, Alipo J. Papasin, Antonio S. Galuno, and Lester B. Ledesma, formerly of the *M/T Nordic Passat*; and Jonathan G. Panti, formerly of the *M/V Cape Maas*. The award shall be payable following the Clerk's receipt of the criminal fine from the defendants or installments thereof.

---

HON. SUSAN D. WIGENTON
United States District Judge

## CERTIFICATE OF SERVICE

I, the undersigned attorney in the Office of the United States Attorney for the District of New Jersey, Newark, New Jersey, hereby certify that on this day I caused to be served copies of the Government's Unopposed Motion for Whistleblower Awards and proposed Order, upon the following parties,

REGULAR MAIL:

> Hon. Susan D. Wigenton
> United States District Judge
> Martin Luther King, Jr. Federal Building and Courthouse
> 50 Walnut Street
> Newark, New Jersey 07102

ECF:

> Tom Mills, Esq.
> Winston & Strawn LLP
> 1700 K Street, N.W.
> Washington, D.C. 20006-3817

I certify under penalty of perjury that the foregoing is true and correct.

KATHLEEN P. O'LEARY
Assistant U.S. Attorney

Dated: August 8, 2013